EXHIBIT A

(https://www.traviscountytx.gov)

## District Clerk - AARO - Attorney Access to Records Online

# Details

Updated : Monday, August 7, 2017 5:14:10 AM

| | | |
|---|---|---|
| **Cause Number** | D-1-GN-17-003063 | Request Documents (/aaro/Content/record_search |
| **Style** | REZKO V XBIOTECH ET AL | |
| **Filed Date** | 7/6/2017 | New Search (/aaro/) |
| **Court** | 200 | |
| **Type** | CLASS ACTION (GEN LIT ) | |
| **Case Status** | PENDING | |
| **Action/Offense** | | |
| **Hearing Date** | | |

| Attorney | Type | Party - Full/Business | Party - Person |
|---|---|---|---|
| | DEFENDANT | WR HAMBRECHT PLUS CO LLC | |
| | DEFENDANT | | VASELLA , DANIEL |
| | DEFENDANT | | MCKENZIE , W THORPE |
| | DEFENDANT | | BONANNI , FABRIZIO |
| | DEFENDANT | | HAN , QUEENA |
| | DEFENDANT | XBIOTECH INC | |
| BAJWA YUSUF AHMAD | PLAINTIFF | | BANK , ANDREW |
| BAJWA YUSUF AHMAD | PLAINTIFF | | LE , AARON |
| BAJWA YUSUF AHMAD | PLAINTIFF | | REZKO , YOGINA |
| | DEFENDANT | | SIMARD , JOHN |

| Date | Court | Party | Description | Category | Pages | |
|---|---|---|---|---|---|---|
| 7/6/2017 | 200 | PL | ORIGINAL PETITION/APPLICATION | PET-PL | 35 | Download (/aaro/Default/GetPdf?barCodeId=5284668) |

Request Documents (/aaro/Content/record_search_fillable.pdf)

New Search (/aaro/)

© 2017 Travis County, Texas - All rights reserved.

7/6/2017 10:38 AM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-17-003063**
**Carrisa Escalante**

CAUSE NO. **D-1-GN-17-003063**

| | | |
|---|---|---|
| YOGINA REZKO, AARON LE, and | § | |
| ANDREW BANK, Individually and on | § | |
| Behalf of All Others Similarly Situated, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| XBIOTECH INC., JOHN SIMARD, | § | |
| QUEENA HAN, FABRIZIO BONANNI, | § | |
| W. THORPE MCKENZIE, DANIEL | § | |
| VASELLA, and WR HAMBRECHT + | § | |
| CO., LLC, | § | **200TH** JUDICIAL DISTRICT |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' ORIGINAL PETITION

Plaintiffs Yogina Rezko, Aaron Le, and Andrew Bank ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Original Petition against Defendants (defined below), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding XBiotech Inc. ("XBiotech" or the "Company"), and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   DISCOVERY CONTROL PLAN

1.   Discovery in this case is intended to be conducted under a Level 3 discovery control plan under Texas Rules of Civil Procedure Rule 190.

## II.    PARTIES

2.      Plaintiff Yogina Rezko purchased shares of XBiotech's securities that were issued pursuant and traceable to the Registration Statement and Prospectus (collectively the "Offering Documents") issued in connection with XBiotech's Initial Public Offering (the "IPO" or the "Offering"), and was substantially damaged thereby. Plaintiff Yogina Rezko resides inLos Angeles County, California.

3.      Plaintiff Aaron Le purchased shares of the Company's securities that were issued pursuant and traceable to the Registration Statement and the Offering, and was substantially damaged thereby. Plaintiff Aaron Le resides in San Mateo County, California.

4.      Plaintiff Andrew Bank purchased shares of the Company's securities that were issued pursuant and traceable to the Registration Statement and the Offering, and was substantially damaged thereby. Plaintiff Andrew Bank resides in King County, Washington.

5.      Defendant XBiotech is incorporated in Canada and maintains its headquarters at 8201 E. Riverside Drive, Bldg. 4, Suite 100, Austin, Texas 78744. XBiotech is a clinical-stage biopharmaceutical company engaged in the discovery and development of True Human monoclonal antibodies for treating various diseases.  XBiotech's lead product is Xilonix, a novel anti-cancer agent. XBiotech's shares trade on NASDAQ under the ticker "XBIT."

6.      Defendant John Simard ("Simard") is the Company's Chief Executive Officer ("CEO"), President, and Chairman. Defendant Simard signed the IPO Registration Statement.

7.      Defendant Queena Han ("Han") is the Company's Vice President of Finance and Human Resources as well as the Principal Financial Officer and Principal Accounting Officer. Defendant Han signed the IPO Registration Statement.

2

8.      Defendant Fabrizio Bonanni ("Bonanni") is a Director of the Company. Defendant Bonanni signed the IPO Registration Statement.

9.      Defendant W. Thorpe McKenzie ("McKenzie") is a Director of the Company. Defendant McKenzie signed the IPO Registration Statement.

10.     Defendant Daniel Vasella ("Vasella") is a Director of the Company.  Defendant Vasella signed the IPO Registration Statement.

11.     Defendants Simard, Han, Bonanni, McKenzie, and Vasella are collectively referred to herein as the "Individual Defendants."

12.     Defendants Simard and Han were directly involved in the day-to-day operations of the Company at the highest levels.

13.     Each of the Individual Defendants:

        a.      signed the Offering Documents;

        b.      directly participated in the management of the Company;

        c.      was privy to confidential proprietary information concerning the Company and its business and operations;

        d.      was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and incomplete Offering Documents; and

        e.      approved or ratified these statements in violation of the federal securities laws.

14.     Defendant XBiotech and the Individual Defendants are referred to collectively herein as the "XBiotech Defendants."

15.     Defendant WR Hambrecht + Co., LLC ("WR Hambrecht" or the "Underwriter Defendant") was the underwriter for the Company's Offering. Defendant WR Hambrecht

3

assisted in drafting and disseminating the Offering Documents and sold all 4,000,000 shares of XBiotech in the IPO. Defendant WR Hambrecht has an office located at 909 Montgomery Street, 3rd Floor, San Francisco, CA 94133.

16.     Defendant XBiotech, the Individual Defendants, and defendant WR Hambrecht are collectively referred to herein as "Defendants."

## II.  JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (15 U.S.C. §§ 77k, 77l(a)(2), and 77o).   This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, which explicitly states that "[e]xcept as provided in section 16(c), no case arising under this title and brought in any State court of competent jurisdiction shall be removed to any court in the United States." Section 16(c) of the Securities Act refers to "covered class actions," which are defined as lawsuits brought as class actions or brought on behalf of more than 50 persons asserting claims under state or common law. This is an action asserting federal law claims. Thus, it does not fall within the definition of a "covered class action" under §16(c) and therefore is not removable to federal court under the Securities Litigation Uniform Standards Act of 1998.

18.     Jurisdiction is also proper as the events and/or omissions giving rise to the claims asserted herein occurred in the State of Texas.

19.     In addition, jurisdiction is proper with respect to the XBiotech Defendants because they are residents of the State of Texas and/or transact business in Texas.  XBiotech's principal offices are located in Austin, Texas, while Defendants Simard and Han are residents of the State of Texas.

20.     Defendants Bonanni, McKenzie, Vasella, and WR Hambrecht have sufficient contacts with the State of Texas, or otherwise have purposefully availed themselves of benefits from Texas or have property in Texas so as to render the exercise of jurisdiction over each Defendant by Texas courts consistent with traditional notions of fair play and substantial justice.

21.     Further, jurisdiction is proper because all Defendants have agreed to submit to the jurisdiction of the Texas courts.

22.     The damages sought are within the jurisdictional limits of this Court, and Plaintiffs seek monetary relief over $1,000,000.

23.     Venue is proper in Travis County pursuant to Section 22(a) of the Securities Act and 15 U.S.C. § 77v(a) because the XBiotech Defendants are residents of this County and/or transaction business in this County, the Offering materials were prepared in whole or in part within the State of Texas and in this County, the Prospectus was transmitted to the State of Texas and in this County, and Defendants engaged in activities in connection with the IPO in the State of Texas and this County by offering the securities in the state and county. Additionally, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

24.     Venue is also proper in this County pursuant to §§ 15.002 and 15.005 of the Texas Civil Practice & Remedies Code.  All or a substantial part of the events or omissions giving rise to the claims asserted herein occurred in Travis County.  In addition, Travis County is the county of XBiotech's principal place of business.  Accordingly, this Court has venue of all the Defendants in all claims or actions arising out of the same transaction, occurrence, or series of transactions or occurrences described or referenced herein.

## IV.  BACKGROUND AND SUBSTANTIVE FACTS

*Overview*

25.     This is a securities class action on behalf of a class of all persons other than Defendants who purchased XBiotech securities pursuant and/or traceable to the Company's Offering Documents, declared effective by the SEC on April 15, 2015, issued in connection with the Company's IPO seeking to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under the Securities Act of 1933 (the "Securities Act").

26.     XBiotech is a clinical-stage biopharmaceutical company engaged in the discovery and development of "True Human" antibodies intended for the treatment of a variety of diseases. True Human antibodies, according to the Company, "are those which occur naturally in human beings" and "have the potential to be safer and more effective than their non-naturally occurring counterparts."[1]   The Company's lead product candidate is known as "Xilonix," to which the Company devotes the majority of its resources and efforts.  Xilonix is intended to treat patients with advanced colorectal cancer, especially those who have reduced tolerance for toxic therapy.

27.     The Company had obtained the "Fast Track" designation from the U.S. Food and Drug Administration ("FDA") in connection with its currently ongoing Phase III trial for Xilonix's treatment of symptomatic colorectal cancer in Europe (the "Phase III Trial"). The Company began the Phase III Trial in July 2014, seeking to recruit at least 276 patients from approximately 40 clinical trials sites in European nations such as the United Kingdom, France, Germany, Poland, and Belgium.

---

[1] Registration Statement at 1; Prospectus at 1.

28.     The Company's Phase III Trial team was spearheaded by its chief executive officer, Defendant John Simard, who refused to allow his lack of prior experience with oversight of a global clinical trial deter him from micromanaging the Phase III Trial.  In an effort to cut costs, Defendant Simard hired a small, seemingly unknown site management organization ("SMO") based in Eastern Europe, rather than a reputable, more established contract research organization ("CRO"), which provides clinical trial, management, and other research support services for the sponsors of biopharmaceutical trials, to administer the Phase III Trial.[2] Defendant Simard then set a timeline for completion of the Phase III Trial of "mid 2015," despite the fact that experienced colleagues had variously advised him that the timeline could not be achieved.  Indeed, one of his senior colleagues advised Simard that the timeline was "absolutely unrealistic," if not virtually impossible, to meet under then-existing circumstances.

29.     Soon after commencing the Phase III Trial in July 2014, the Company encountered significant problems in enrolling patients.  Among other things, an unexpectedly large number of patients who had managed to survive the initial screening evaluation and meet the threshold inclusion criteria simply were not physically healthy enough to return to the site locations and continue with the study.  Defendant Simard received regular, weekly reports detailing these enrollment problems and also had access to the Electronic Data Capture and Interactive Voice/Web Response systems, which would allow him to check the status of patient enrollment at any time and obtain updated information.

---

[2] As explained more fully below, an SMO may be distinguished from a CRO based on the scope of responsibilities entrusted to the organization.  Whereas SMOs generally are limited to managing a specific trial site(s), involving tasks such as patient recruitment and administration of the testing protocol, CROs are entrusted with a comparatively greater scope of responsibility for protocol design, data management, monitoring of the investigation and/or statistical analysis.

30.     Despite his knowledge of the ongoing patient enrollment problems which the Company was encountering in the Phase III Trial, Defendant Simard not only failed to implement measures sufficient to mitigate the problems, but also refused—over objections from senior advisors—to adjust his unrealistic timeline for completion of the Phase III Trial, which he had set as "mid-2015." By late 2014, the Company needed more capital to fund its development of Xilonix. Accordingly, the Company prepared for its IPO by filing a Registration Statement on February 2, 2015, which was subsequently amended three times before being declared effective by the SEC on April 15, 2015, and its Prospectus on April 16, 2015.

31.     The Registration Statement and Prospectus contained false material statements of fact and/or failed to disclose material statements of fact that rendered the affirmative statements in the Offering Documents false. The Company stated that it expected to enroll "at least 276 patients" in the Phase III Trial and complete the study by "mid-2015." These statements were false because the Offering Documents failed to disclose that the Company's stated timeline for completion of the Phase III Trial could not be met without drastically increasing the number of clinical sites. An increase in the number of clinical sites would result in a concomitant increase in the Company's costs, as well as create insurmountable quality control problems. The Offering Documents also failed to disclose that the Company had already experienced substantial delays in achieving its patient enrollment targets in the early stages of the Phase III Trial beginning in July 2014. This omission rendered the Company's disclosure of the hypothetical risk that the Company may encounter delays in patient enrollment meaningless since the risk had already materialized, rendering investors unaware of the hard facts necessary to appreciate the magnitude of the risk described by the Company.

32.     In addition, the Offering Documents represented that the Company had only "limited influence" over the CRO's "actual performance" in administering the Phase III Trial. These statements were false because, as the clinical trial sponsor, the Company was responsible for overseeing the CRO's performance and for implementing processes to ensure that the trial was conducted in accordance with regulatory and industry-wide standards.  Moreover, Defendant Simard's management style indicated that he was likely to exercise, and in fact did exercise, material influence over KCR's administration of the Phase III Trial.  The Offering Documents also failed to disclose the "red flags" about the Company's selected CRO, KCR—its size, its limited capabilities, its lack of qualified employees by training or experience, its lack of an established reputation, its background as an SMO rather than a CRO, and its failure to build a domestic presence in the United States.

33.     The Offering Documents also stated that the Company relied heavily on Defendant Simard in terms of business strategy, management of the Company, and in the Company's research and development, while touting his industry experience and past leadership positions.  These statements were incomplete because they failed to disclose that Defendant Simard lacked any experience with management of clinical trials.

34.     On the morning of July 28, 2015, the Company issued a press release and held an earnings conference call in which the Company and Defendant Simard revealed that contrary to the Offering Documents, the Phase III Trial "is expected to be completed towards the end of this year," and that "enrollment is a little less than what we would like to be at this juncture." Defendant Simard continued by disclosing that "[w]e now may see enrollment carry on into September, but our timeline to have a readout by year end should not be affected."

35.     As a result of this adverse news, XBiotech's share price declined over 7.5%.

36.     Several months later, after the market closed on November 23, 2015, the Company issued a press release entitled "XBiotech Provides Update on Phase III Oncology Study in Europe," which revealed for the first time the occurrence of numerous "irregularities" in the data obtained from 72 patients enrolled in the Phase III Trial, which would result in the study having "reduced statistical power to demonstrate the proposed effect."  This adverse news caused the Company's stock price to decline $4.50 per share, or approximately 34%, to close at $8.75 per share on November 24, 2015, on unusually heavy volume.

37.     In failing to disclose Defendant Simard's lack of experience with oversight of a global clinical trial, his selection of a CRO with limited capabilities, and the existence of ongoing problems with patient enrollment, the Company deprived investors of information necessary to evaluate the Company's ability to properly manage and complete the Phase III Trial in accordance with the stated timeline.  As a result of Defendants' wrongful acts and omissions, and the consequent precipitous declines in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

***Background***

38.     XBiotech is a pharmaceutical company attempting to discover and develop antibody therapies, known as "True Human" antibodies, which are derived from natural immunity to disease.  True Human antibodies, according to the Company, "are those which occur naturally in human beings" and "have the potential to be safer and more effective than their non-naturally occurring counterparts."[3]

39.     XBiotech's lead product is Xilonix, which is currently the subject of two pivotal clinical studies regarding the treatment of patients with colorectal cancer.  According to the

---

[3] Registration Statement at 1; Prospectus at 1.

Company itself, "[t]he majority of our efforts to date have been concentrated on developing [Xilonix]."[4]

### *The Phase III Trial*

40.     One of the Company's two pivotal studies is the Phase III Trial currently underway in Europe, which is aimed at evaluating Xilonix's treatment of patients with symptomatic colorectal cancer.  "If these trials are successful," the Company's stated intention is to "seek marketing approvals for [Xilonix] in Europe and/or in the United States," and then "distribute and sell this product through our own direct sales force or with a commercial partner."[5]

41.     The Phase III Trial began in July 2014, with a stated recruitment goal of at least 276 patients from approximately 40 clinical trial sites across Europe, including sites located in the United Kingdom, France, Germany, Poland, and Belgium.  The study's primary objective is to evaluate the efficacy of Xilonix in reversing the symptoms of patients with advanced colorectal cancer, including muscle loss, fatigue, appetite loss, and pain.  The Company intends to measure the efficacy of Xilonix by assessing the change in these symptoms for patients treated with Xilonix as compared to those who were treated with the placebo.

### *The Company's CEO, Defendant Simard*

42.     According to a former employee ("FE1"),[6] XBiotech's CEO, Defendant Simard, did not have any experience with oversight of a large, global clinical trial like the Phase III Trial.

---

[4] Registration Statement at 1; Prospectus at 1.
[5] Registration Statement at 1; Prospectus at 1.
[6] FE1 was Vice President of Clinical Operations at XBiotech from June 2014 to February 2015. In that role, FE1 was responsible for overseeing the clinical trials for Xilonix and was one of XBiotech's two liaisons for the CRO about the Phase III Trial's progress.  FE1 reported directly to Defendant Simard and was one of two XBiotech employees who briefed Defendant Simard on weekly developments in the Phase III Trial.  FE1 has worked in the biopharmaceutical industry

Based on his interactions with Defendant Simard during weekly meetings which were held throughout the term of his employment at the Company and at which the Phase III Trial was discussed, FE1 stated that Defendant Simard "doesn't know anything about the management of clinical trials." The Offering Documents are silent as to Defendant Simard's experience, or lack thereof, in the management of clinical trials.

43.     Notwithstanding Defendant Simard's lack of experience with oversight of large, global clinical trials, the Company relied heavily on him in all, or nearly all, aspects of its business.   In the Offering Documents, the Company stated as follows: "Our future success depends in significant part on the continued service of our Chief Executive Officer, John Simard. Mr. Simard is critical to the strategic direction and overall management of our Company as well as our research and development process. … The loss of Mr. Simard could adversely affect our business, financial condition and operating results."[7]

44.     Nor did Defendant Simard's lack of experience in overseeing large, global clinical trials prevent him from micromanaging all, or nearly all, of the Company's initiatives. According to FE1, the Phase III Trial was no exception.   FE1 recalls that Defendant Simard insisted on controlling virtually every aspect of the Xilonix trials.   Defendant Simard "has 100 percent to do with everything [at XBiotech]," according to FE1, and "he overreaches [given] his expertise."   Upon reflection, FE1 stated that he "never [before] had [experienced] the level of involvement of the CEO," and that Defendant Simard's management style led some "very seasoned" XBiotech employees to leave of their own accord "because of the environment."   FE1

---

for more than 20 years.  Prior to being employed at XBiotech, FE1 was, among other things, a Senior Director of Clinical Development at INC Research and an Associate Director of Clinical Research at Genzyme Corporation.

[7] Registration Statement at 21; Prospectus at 21.

observed that Defendant Simard generally did not trust the judgment of his colleagues and instead preferred to make most decisions himself.

***Selecting and Retaining a CRO***

45.     Due to the complexities inherent in managing clinical trials of the size and scope of the Phase III Trial, it is common for even the largest biopharmaceutical companies to enter into agreements with CROs to manage the conduct of trials on the ground—particularly trials conducted abroad in numerous countries.  Retention of a CRO allows a sponsor to benefit from the CRO's specialized expertise, data management capabilities, and ability to speed the process of bringing a product candidate to market.

46.     Generally, the sponsor and the CRO negotiate the terms of the CRO's scope of authority for the trial, according to FE1, and the CRO's responsibilities may vary considerably based on the capabilities of the CRO.  Ultimately, however, the sponsor is responsible for ensuring that the CRO fulfills the duties which it has been allocated under the terms of the parties' agreement.  Typically, though, the CRO bears responsibility for ensuring that patients receive the correct dosage, according to another former XBiotech employee ("FE2"),[8] whereas the sponsor usually assumes responsibility for monitoring general trends in patient enrollment and "put[ting] processes in place to get feedback from the investigators about mitigating [the attrition]," according to FE1.

---

[8] FE2 was Director of Clinical Operations at XBiotech from June 2012 to March 2016.  In that role, FE2 was responsible for oversight of the Phase III Trial, and acted as a point of contact for the CRO.  Among other things, FE2 budgeted for clinical sites, managed internal operations, informed the CRO employees of their tasks and timeline, and ensured that the CRO was monitoring the clinical sites adequately.  FE2 reported to Defendant Simard and FE1.

47.     The selection of a CRO often calls into account the priorities of the sponsor for the study, since not all CROs are created equal.  CROs may distinguish themselves from one another in terms of capabilities, size, pricing, and reputation, among other things.

48.     CROs may be distinguished from site management organizations ("SMOs") based upon the scope of their responsibility and work in connection with a clinical trial.  Whereas CROs generally are entrusted with responsibility (in varying degrees) for protocol design, data management, monitoring of the investigation and/or statistical analysis, SMOs are limited to management of a specific trial site(s), performing tasks such as patient recruitment and administration of the testing protocols.  The services provided by CROs tend to be much more expensive when compared to those provided by SMOs.

49.     The relative size of the CRO tends to have significant implications for sponsors when choosing which CRO to engage for a clinical trial.  To quote Zachary Brennan of *outsourcing-pharma.com*, "[t]he perception that larger CROs guarantee a higher level of safety seems to permeate" the industry.[9]   In an October 21, 2014 article published online, Brennan interviewed Mike Jagielski, the CEO of KCR, which in fact was the CRO selected by XBiotech to administer the Phase III Trial.  Jagielski painted the following contrast between larger and smaller CROs: "Size can be an advantage depending on perspective.  You are a large CRO that suggests security, therefore making a safe decision for execution.  I would say this is certainly the case if a large pharma company would like to outsource the development of entire programs."[10]   On the other hand, smaller CROs, according to Jagielski, "have the advantage of

---

[9]  *http://www.outsourcing-pharma.com/Clinical-Development/Do-mid-size-CROs-have-business-model-problems-One-CEO-thinks-so.*
[10]  *Id.*

flexibility and rapid decision making.  Execution standard can be easier adjusted to the client needs, innovations can be adapted faster – it is simply a matter of scale."[11]

50.     In other words, a smaller CRO typically places the sponsor closer to the investigators who are actually on the ground at the trial sites, which tends to allow for the creation of a more flexible and customized arrangement to suit the sponsor's preferences.  By contrast, a larger CRO typically places additional layers of personnel at the investigation sites, which minimizes flexibility due to coordination issues but provides added security in the form of increased scrutiny and quality control during the course of the investigation.  The involvement of more personnel, of course, typically carries with it a larger price tag for the services performed by larger CROs.

51.     A CRO's reputation within the industry also seems to have at least a rough correlation with its size.  According to an August 18, 2014 article written by Zachary Brennan of *outsourcing-pharma.com*,[12]  a review of the clinical trials database at *clinicaltrials.gov* reveals that, of the trials run by the "top" CROs, "the largest CROs are scooping up the most trials as collaborators," with "the big players … leaving little room for smaller firms to compete."[13]

***The Company's Selection of KCR as its CRO***

52.     FE1 and FE2 state that the Company selected KCR, an entity formerly known as "Kiecana Clinical Research," as its CRO in advance of the Company's launch of the Phase III Trial in July 2014.

---

[11] *Id.*

[12] *http://www.outsourcing-pharma.com/Clinical-Development/Top-CROs-dominate-competition-in-trial-totals-review-finds.*

[13] *Id.*

53.     At the time it was retained by XBiotech, KCR, according to one of its own former employees ("KCR FE"),[14] was a small company based in Warsaw, Poland that had ambitions of becoming a "big player" in the CRO industry.[15]   Yet even though "KCR fancied themselves as a global CRO," in reality it was merely a small Eastern European company servicing a niche market, having more often been retained by sponsors as an SMO, rather than as a CRO.

54.     In or about September 2012, when KCR FE was hired, KCR invested about $14 million to establish an office and a presence in the United States, with plans to hire eight or nine individuals there.   After a few years without much success in the United States, however, KCR determined, according to KCR FE, that it would cut back on those plans, in the process laying off most of its U.S.-based staff, including KCR FE.   FE1 confirms that KCR had failed to make a name for itself among CROs, stating that, despite his twenty-two years of experience managing clinical trials, he had not even heard of KCR before he began working at XBiotech on the Phase III Trial.

55.     KCR FE's statements regarding KCR's standing within the industry are corroborated by Zachary Brennan's August 18, 2014 article discussing the "top CROs." Although Brennan mentions at least 10 CROs, of varying sizes, in his article, he makes no mention of KCR.[16]

56.     According to its own website, even today KCR does not consider itself to be among the elite CROs.   Rather, KCR touts itself as "a reliable alternative to top tier CROs,

---

[14] KCR FE worked as Director of Business Development at KCR (U.S.) from September 2012 to September 2013, and as Executive Director of Business Development from September 2013 to November 2014.

[15] According to *outsourcing-pharma.com*, KCR moved its headquarters to Berlin, Germany in or around March 2015.     *See http://www.outsourcing-pharma.com/Clinical-Development/KCR-shifts-head-office-from-Warsaw-to-Berlin-to-get-closer-to-clients.*

[16] *http://www.outsourcing-pharma.com/Clinical-Development/Top-CROs-dominate-competition-in-trial-totals-review-finds.*

delivering the all-important flexibility,"[17] which is consistent with the comments made by KCR's CEO regarding the "flexibility"/"security" dichotomy quoted above.

57.     KCR's status as a relatively small player in the CRO market, its background as predominantly an SMO rather than a CRO, along with the implications of that SMO background for KCR's pricing structure, and its touting of flexibility in the provision of clinical trial services were all characteristics that Defendant Simard found appealing.   These factors combined to facilitate an arrangement between XBiotech and KCR that would limit the Company's costs while allowing Defendant Simard significant opportunities to intervene in and micromanage the study's administration.   Investors were not informed of the potential drawbacks of this arrangement, including the risks that KCR's capabilities may be ill-suited for the Phase III Trial, that its employees did not have the requisite training and experience in the conduct of such trials, and that KCR may not have put into place adequate quality controls to ensure proper on-site execution.

58.     The risk that KCR might fail to execute properly the Phase III Trial was amplified by Defendant Simard's inexperience with oversight of a global clinical trial of such size and scope, and by his ineffective and heavy-handed management style.   According to FE1, Defendant Simard continually micromanaged KCR's administration of the study and his efforts failed to address the emerging irregularities in the study data because he "didn't know what questions to ask" and failed to implement processes which were necessary to mitigate the problems.

***Formulating the Company's Phase III Trial Timeline***

---

[17] *http://www.kcrcro.com/uploads/attachments/KCR_Brochure_Gen_SCREEN_upd.pdf.*

59.     Soon after launching the Phase III Trial in July 2014, KCR encountered problems in the enrollment of patients.  According to FE2, certain countries in which the study was being conducted had "crazy vacation policies," which resulted in slower-than-expected enrollment during the study's early months.  Another enrollment problem which KCR encountered in the study's early months was what FE2 described as an "extremely sick" patient population.  An unexpectedly large number of patients who had managed to survive the initial screening evaluation and meet the threshold inclusion criteria simply were not physically healthy enough to return to the site locations and continue with the study.

60.     According to FE2, XBiotech and KCR each had a study team, and each member of those teams had access to patient data.  XBiotech's study team consisted of 10-12 members, including, among others, FE1, FE2, two project managers, the Director of Biostatistics, the Director of Data Management, and at least one member of senior management, the Company's Medical Director, Michael Stecher.  FE1 confirms that Defendant Simard had ready access to the updated status of the enrolled patients through the Electronic Data Capture and Interactive Voice/Web Response systems.  Enrollment data was available in real time, according to FE2, because such data were entered into a centralized patient database, consisting of a portal through which all study information was entered.

61.     FE2 states that KCR provided oversight of the clinical sites and provided frequent updates on the progress of enrollment.  The Company's study team had conference calls with KCR on a regular basis, which was "at least twice per month" and sometimes "weekly when there was lots of activity."  Additionally, each week KCR presented the Company's study team with an Excel spreadsheet, known as the "Dashboard," which tracked the progress of the Phase III Trial.  The Dashboard consisted of timelines and other metrics, and was updated by KCR on a

weekly basis.   FE1 confirms that enrollment data were delivered to the members of the Company's study team in this format on a regular basis, and that FE1 personally provided the data to Defendant Simard via email on a regular basis.   FE1 states that these weekly emails were sent each Friday (or the following Monday at the latest) and provided a "comprehensive overview of the current phase of the trial."   Each weekly email was approximately one page in length and included information summarizing the data received from KCR about risks, enrollment, the status of each trial site, and site feedback.   The weekly summary emails regarding the status of the Phase III Trial was one of the ways in which FE1 fulfilled his role of ensuring that senior management was kept abreast of developments during the trial's progress.

62.     In addition, FE2 recalls that the Company held "enrollment meetings" on a regular basis.   These meetings were attended by employees from the Clinical Operations department, including personnel from the statistics, medical monitoring, and clinical operations divisions.   FE2 also recalls that the Company held "governance calls" on a regular basis, at which XBiotech's senior management, including Defendant Simard, participated.

63.     According to FE1, Defendant Simard "knew [how many patients were enrolled] on a day-to-day or week-to-week basis – he received weekly spreadsheets showing the actual enrollment versus projections."   FE1 explains that, during the fourth fiscal quarter of 2014 and early 2015, he participated with Defendant Simard in weekly meetings during which the progress of the Phase III Trial was discussed.   The Company's Medical Director, Michael Stecher, and Director of Biostatistics, Prasant Mohanty, also regularly attended these meetings.   "All info about not hitting [enrollment] targets is known," according to FE1.   "You get data every day about each clinical site, by email or phone from the CRO or electronically."   Moreover, FE1 recalls that he could log onto the Electronic Data Capture and Interactive Voice/Web Response

systems at any time and check the status of patient enrollment, and that Defendant Simard had the same access.

64.     The problems with patient enrollment in the Phase III Trial became more obvious for the Company in late 2014 and early 2015, as XBiotech prepared for its upcoming IPO.  In the Company's original Registration Statement filed with the SEC on February 2, 2015, Defendant Simard sought to include a timeline for the Phase III Trial in the filing that would inform investors that the study would enroll "at least 276 patients" and that the study was "expected to be completed by mid-2015."

65.     FE1 considered these deadlines "absolutely unrealistic," if not virtually impossible to meet: "[T]here was no way in the world to do it without increasing the number of sites."  For this conclusion FE1 relied upon the information furnished on a regular basis by KCR: "Typically the way forecasts [of the pace of patient enrollment] are projected, the customer tells KCR when we'd like to finish the trial and [KCR] says, 'If you want that, you need an enrollment rate of X, [and] you need this many sites who will enroll a certain number of patients per month.'"  To achieve Defendant Simard's goals, according to FE1, "would cost more" and FE1 estimated that 40-to-50-percent additional sites were needed.  With the actual number of sites, FE1 said, "there was no way [the enrollment goal] could be met."

***Defendant Simard's Retention of a Consultant***

66.     In response to the Phase III Trial's ongoing enrollment problems in late 2014, FE1 states that he proposed to Defendant Simard that the Company secure a bid from a recognized patient recruitment services company with which FE1 had previously worked.  FE1 states that he had engaged this well-known company to address similar issues in a previous

complex study for his prior employer with a budget in excess of $1 million.  According to FE1, however, Defendant Simard refused to entertain such a bid, presumably due to cost concerns.

67.    Instead of considering bids from respected patient recruitment specialists, according to FE1, Defendant Simard retained a Dallas-based consultant who possessed questionable credentials and had done unspecified work on recruitment websites in the past.  FE1 recalls that, under the consultant's arrangement with Defendant Simard, the consultant was paid on an hourly basis for a limited number of hours per week and received stock incentive compensation.  The consultant began advising Defendant Simard in late 2014 and, according to FE1, was still advising Defendant Simard when FE1 left the Company in February 2015.  FE1 recalls that the consultant resided in Dallas and did not typically work on site.

68.    The centerpiece of the advice provided to the Company by Defendant Simard's retained consultant, according to FE1, was the creation and maintenance of an "advocacy website," which would facilitate patient recruitment for the Phase III Trial.  FE1 recalls that the consultant intended for the website to provide information concerning the Phase III Trial to those individuals interested in participating in the study, and that the consultant wanted to activate the website quickly.   Upon being advised by Defendant Simard of his intention to activate the consultant's proposed website, FE1 protested that the Company could not activate such a website without first obtaining approval of the website's contents from the institutional review board ("IRB") as required by FDA regulations.[18]    Moreover, in FE1's view, going live with an

---

[18] *See Guidance for Institutional Review Boards and Clinical Investigators* (attached hereto as Exhibit A).  FDA guidelines provide that "[a]dvertisements [directed to potential study subjects] should be reviewed and approved by the IRB as part of the package for initial review," since the FDA "considers direct advertising for study subjects to be the start of the informed consent and subject selection process."   IRB review is intended by the FDA as a procedural safeguard to ensure that the advertising "is not unduly coercive and does not promise a certainty of cure beyond what is outlined in the consent and the protocol."

unapproved website was outside industry norms.  The consultant had assured Defendant Simard, according to FE1, that he had activated a similar website previously for another client without obtaining prior IRB approval and had "no issue."

69.     FE1 states that although the consultant's proposed website had not been activated by the Company as of February 2015, when FE1 left XBiotech, and does not know whether Defendant Simard ever implemented the consultant's strategy, the incident further illustrates Defendant Simard's lack of familiarity with applicable FDA regulations.

***Defendant Simard Overrules Objections to His Enrollment Goal and Timeline***

70.     During weekly meetings held in Defendant Simard's office, at which the Company's Medical Director, Michael Stecher, was in attendance, FE1 and other XBiotech employees advised Defendant Simard that his enrollment goal and targeted timeframe for completion of the study were unrealistic, but "[h]e didn't like it," and "that's how you become marked [for termination], if you will."   Despite these known concerns, Defendant Simard's enrollment goal and timeline for completion of the Phase III Trial were included in the Registration Statement filed with the SEC.  FE1 states that he participated in meetings with Defendant Simard during the fourth fiscal quarter of 2014 and early 2015, prior to the February 2, 2015 filing of the Registration Statement, that the low patient enrollment data were discussed, and that Defendant Simard rejected FE1's position.

## V.  FALSE AND INCOMPLETE STATEMENTS

71.     In a section of the Registration Statement and Prospectus, beginning on page 56, entitled "Current Clinical Investigation Activity," the Company stated, among other things, the following:

> The study, which started in July 2014, will enroll at least 276 patients and is expected to be completed by mid-2015. As of

March 3, 2015 about 122 patients had been enrolled. If the study
endpoints are satisfactorily achieved, we expect to submit a
registration package to the EMA and possible other foreign
regulatory agencies.[19]

72.     The foregoing statements about the patient enrollment and progress for the
clinical study in the Registration Statement and Prospectus were materially false and incomplete.
Immediately prior to the Offering: (a) daily and weekly patient enrollment data showed that KCR
encountered problems in attaining the target numbers for patient enrollment; (b) data from KCR
indicated that the Company would be unable to reach the stated enrollment target within the
stated timeframe without substantially increasing the number of trial sites and the Company's
costs; and (c)  warnings provided by senior Company employees, such as FE1, who advised
Defendant Simard during weekly meetings that attaining the stated patient enrollment target
within the stated timeframe was "absolutely unrealistic," and that, with the number of trial sites
then in operation, "there was no way [the enrollment goal] could be met."  The "absolutely
unrealistic" stated patient enrollment target, in turn, rendered the stated "mid-2015" deadline for
completion of the study "absolutely unrealistic" as well.  In fact, the Company did not announce
completion of patient enrollment until August 17, 2015, and then provided an "update" on
November 23, 2015 on its "findings related to enrollment in the study."

73.     In a section of the Registration Statement and Prospectus, beginning on page 10,
entitled "Risks Related to Our Business," the Company stated, among other things, the
following:

> [W]e rely on Clinical Research Organizations (CROs) and clinical
> trial sites to ensure the proper and timely conduct of our clinical
> trials, and while we have agreements governing their committed

---

[19] Registration Statement at 56; Prospectus at 56.

activities,    we    have    limited    influence    over    their    actual
performance.[20]

74.      The  foregoing  disclosures  concerning  the  risks  relating  to  the  Company's
common stock were false and incomplete, and/or lacked a reasonable basis therefor, because the
Company did not have merely "limited influence" over KCR's "actual performance" at the trial
sites.  To the contrary, the Company was responsible for overseeing KCR's performance and for
implementing processes to ensure that the trial were conducted in accordance with regulatory,
contractual, and industry-wide standards.  Moreover, Defendant Simard was likely to exercise,
and in fact did exercise, material influence over KCR's performance due to his important role in
the Company's research and development process and in light of his heavy-handed management
style.  Further, having disclosed its reliance on CROs for the conduct of its clinical trials, and the
general or hypothetical risk of encountering delays in patient enrollment and completing such
trials in a timely manner, Defendants were duty bound, but failed, to disclose the red flags about
KCR.  KCR was a small company which was not regarded as a "top tier" CRO and which
emphasized flexibility over safety in execution; that KCR's recent efforts to build a presence in
the United States had not met with success; that KCR's capabilities had been developed as an
SMO, rather than a CRO; and that, as a result, KCR's employees were not qualified by training
or experience to conduct a global clinical trial of the size and scope of the Phase III Trial.

75.      In the same section of the Registration Statement and Prospectus, the Company
also stated, among other things, the following:

> ***If we are unable to enroll subjects in clinical trials, we will be
> unable to complete these trials on a timely basis.***
>
> Patient enrollment, a significant factor in the timing of clinical
> trials, is affected by many factors including the size and nature of
> the patient population, the proximity of subjects to clinical sites,

---

[20] Registration Statement at 13; Prospectus at 13.

the eligibility criteria for the trial, the design of the clinical trial, ability to obtain and maintain patient consents, risk that enrolled subjects will drop out before completion, competing clinical trials and clinicians' and patients' perceptions as to the potential advantages of the drug being studied in relation to other available therapies, including any new drugs that may be approved for the indications we are investigating. … We may experience delays in enrolling subjects in our trials and may not be able to enroll sufficient subjects to complete the trials.[21]

76.     The foregoing disclosures concerning the risks relating to the Company's common stock were false and incomplete, and/or lacked a reasonable basis therefor, because the Company had and was experiencing substantial delays in achieving its patient enrollment targets in the early stages of the Phase III Trial beginning in July 2014.  Such delays were impacting the projected enrollment numbers to such an extent that FE1, one of the Company's senior employees, advised Defendant Simard that attaining the stated enrollment target within the stated timeframe, without substantially increasing the number of trial sites and the Company's costs, was "absolutely unrealistic." Additionally, by the time the Registration Statement was first filed with the SEC on February 2, 2015, as noted above, the daily and weekly reports available to and/or reviewed by Defendants showed the enrollment problems.

77.     On February 2, 2015, XBiotech filed a Registration Statement on Form S-1 with the SEC.  The Company amended the February 2, 2015 Registration Statement several times, with the third and final amendment filed on Form S-1/A with the SEC on April 10, 2015.   On April 15, 2015, the SEC declared the Company's Registration Statement effective.  On April 16, 2015, the Company filed its Prospectus on Form 424B4 with the SEC.  In a section of the Registration Statement and Prospectus, beginning on page 10, entitled "Risks Related to our Business," the Company stated, among other things, as follows:

---

[21] Registration Statement at 13; Prospectus at 13.

> We are highly dependent on our Chief Executive Officer. Our
> future success depends in significant part on the continued service
> of our Chief Executive Officer, John Simard. Mr. Simard is critical
> to the strategic direction and overall management of our Company
> as well as our research and development process. Although we
> have an employment agreement with Mr. Simard, it has no specific
> duration. The loss of Mr. Simard could adversely affect our
> business, financial condition and operating results.[22]

78.     In a section of the Registration Statement and Prospectus, beginning on page 73,

entitled "Management," the Company stated the following about Defendant Simard:

> John Simard, is founder and Chief Executive Officer of XBiotech.
> Prior to XBiotech, he was founder and Chief Executive Officer of
> CTL ImmunoTherapies Corp., a developer of therapeutic vaccines
> to treat cancer and chronic infectious disease; he also founded of
> AlleCure Corp., of Valencia, California, a developer of allergy
> treatments and immune-modulating therapies. In 2001, AlleCure
> and CTL ImmunoTherapies merged to form MannKind Corp.,
> where Mr. Simard served as Corporate Vice President and board
> member. Mr. Simard holds a degree in Biochemistry from the
> University of Saskatchewan and attended graduate studies in
> Medical Biophysics/Immunology at the University of Toronto. He
> has over 140 issued and pending patents related to cancer therapy,
> therapeutic vaccines and therapeutic antibodies, as well as
> substantial peer-reviewed scientific publications and the textbook
> "Immune Response Genes."
>
> Our board of directors believes that Mr. Simard possesses specific
> attributes that qualify him to serve as a director, including his
> extensive executive leadership experience, his role as founder of
> the company, his many years of service on our board of directors
> and as our Chief Executive Officer, and extensive knowledge of
> our company and industry.[23]

79.     The foregoing statements about Defendant Simard were false because they failed

to disclose that Defendant Simard did not have any experience with oversight of a large, global

clinical trial like the Phase III Trial. This omission precluded investors from information that is

material to an assessment of the Company's prospects for a successful administration of the

---

[22] Registration Statement at 21; Prospectus at 21.
[23] Registration Statement at 73; Prospectus at 73.

Phase III Trial, given the substantial influence which Defendant Simard wielded in the Company's "research and development process."  FE1 states that Defendant Simard's lack of experience proved critical since, in the course of continually micromanaging KCR's administration of the study, he failed to address the emerging irregularities in the study data because he "didn't know what questions to ask" and failed to implement processes which were necessary to mitigate the problems.

## VI.  THE TRUTH EMERGES AND MATERIALIZES

## <u>THROUGH PARTIAL DISCLOSURES</u>

80.    On the morning of July 28, 2015, the Company issued a press release and held an earnings conference revealing patient enrollment in the Phase III Trial.  Defendant Simard stated that the Phase III Trial "is expected to be completed towards the end of this year," and that "enrollment is a little less than what we would like to be at this juncture."  Defendant Simard continued by disclosing that "[w]e now may see enrollment carry on into September, but our timeline to have a readout by year end should not be affected."

81.    As a result of this adverse news, XBiotech's share price declined approximately 7.5% over next three trading.

82.    After market closed on November 23, 2015, the Company issued a press release entitled "XBiotech Provides Update on Phase III Oncology Study in Europe," which revealed for the first time that "25 patients dropped off study prior to receiving any dosing with drug or placebo," "14 patients erroneously received either placebo or study drug," and "33 patients completed the study but failed to receive scheduled DEXA scans, properly complete EORTC

27

evaluation, or both."  According to the press release, "these combined irregularities compromises data from 72 patients in the study," and "oversampling was not performed to accommodate [such] data loss."  Consequently, the study will have "reduced statistical power to demonstrate the proposed effect."

83.     The data loss and other clinical trial problems resulted from Defendants' attempt to enroll patients in accordance with the impossible timeline set forth in the Registration Statement and Prospectus, which Defendants knew at the time was impossible.  There was not sufficient sampling, which resulted in lost data.  In addition, the failure of Defendants to execute properly the Phase III Trial was a direct result of Defendant Simard's undisclosed inexperience with oversight of a global clinical trial of such size and scope, and by his reckless management of the clinical trial.

84.     This adverse news caused XBiotech stock price to decline $4.50 per share, or approximately 34%, to close at $8.75 per share on November 24, 2015, on unusually heavy volume.

## VII.  CLASS ACTION ALLEGATIONS

85.     Plaintiffs bring this action as a class action pursuant to Rule 42 of the Texas Rules of Civil Procedure on behalf of themselves and on behalf of all purchasers of XBiotech securities issued pursuant to and/or traceable to the Company's IPO. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

86.     The members of the Class are so numerous that joinder of all members is impracticable. The precise number of Class Members is unknown to Plaintiffs at this time but it

is believed to be in the thousands.   Members of the Class may be identified by records maintained by XBiotech or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

87.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Defendants' respective wrongful conduct in violation of the federal laws complained of herein.

88.   Plaintiffs have and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.   Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

89.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

f.   whether the federal securities laws were violated by the Defendants' respective acts as alleged herein;

g.   whether the Offering Documents issued by Defendants to the investing public committed and/or misrepresented material facts about the Company and its business; and

h.   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

90.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VIII.  CAUSES OF ACTION

**A.**      ***Count I: Violation of § 11 of Securities Act (Against the XBiotech Defendants)***

91.      Plaintiffs repeat and reallege each and every allegation set forth above.

92.      This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against the XBiotech Defendants only.

93.      The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

94.      XBiotech is the registrant for the IPO.  The Individual Defendants and were responsible for the contents and dissemination of the Registration Statement and, in fact, signed the Registration Statement.

95.      As issuer of the shares, XBiotech is strictly liable to Plaintiffs and the Class for the misstatements and omissions.

96.      None of the relevant Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

97.      By reasons of the conduct herein alleged, the XBiotech Defendants violated, and/or controlled a person who violated Section 11 of the Securities Act.

98.      Plaintiffs acquired XBiotech shares pursuant and/or traceable to the Registration Statement for the IPO.

99.     Plaintiffs and the members of the Class have sustained damages. The value of the Company's shares has declined substantially subsequent to and due to the violations by the XBiotech Defendants.

**B.      Count II: Violation of § 12(a)(2) of the Securities Act (Against the Underwriter Defendant)**

100.    Plaintiffs repeat and reallege each and every allegation set forth above.

101.    This Count is brought pursuant to § 12(a)(2) of the Securities Act on behalf of all persons or entities who purchased XBiotech shares pursuant to the Registration Statement and/or Prospectus against the Underwriter Defendant only.

102.    The Underwriter Defendant was a seller of a security, specifically shares of XBiotech common stock.

103.    By means of the Registration Statement and/or Prospectus, the Underwriter Defendant offered shares of the Company's common stock to the Class in return for $19.00 each. The Underwriter Defendant's actions of solicitation consisted primarily of the preparation and/or dissemination of the Registration Statement and/or Prospectus.

104.    The Underwriter Defendant sold the Company's shares through the use of interstate communication, the use of interstate commerce, and the use of the mails, including the use of a Prospectus, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading.

105.    The Underwriter Defendant cannot prove that it did not know, or in the exercise of reasonable care, could not have known, of the untruth or omission described in the preceding paragraph.

106.    By reason of the conduct alleged herein, the Underwriter Defendant violated § 12(a)(2) of the Securities Act.  As a direct and proximate result of the Underwriter Defendant's

conduct, Plaintiffs and other members of the Class who purchased the Company's shares pursuant to the Registration Statement and/or Prospectus and traceable thereto have suffered substantial damage.  Accordingly, Plaintiffs and the other members of the Class were harmed, and seek damages and/or rescission of the IPO.

**C.**      ***Count III: Violation of § 15 of the Securities Act (Against the Individual Defendants)***

107.     Plaintiffs repeat and reallege each and every allegation set forth above.

108.     This count is asserted against the Individual Defendants only and is based upon Section 15 of the Securities Act.

109.     The Individual Defendants, by virtue of their offices and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of XBiotech within the meaning of Section 15 of the Securities Act. The Individual Defendants had the power and influence and exercised the same to cause XBiotech to engage in the acts described herein.

110.     The Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class.

111.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered.

## IX.  ATTORNEYS' FEES AND COSTS

112.     Section 26.001 of the Texas Civil Practice and Remedies Code and Rule 42 of the Texas Rules of Civil Procedure authorize the award of attorneys' fees and costs in accordance with the provisions of Rule 42(h) and (i).  Plaintiffs' counsel intends to apply for such an award as and when appropriate, consistent with the provisions of Rule 42(h) and (i).

## X.  JURY DEMAND

113.    Plaintiffs hereby request a trial by jury on all claims and issues so triable and tender the required fee in accordance with Rule 216 of the Texas Rules of Civil Procedure.

## XI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

a)    Determining that this action is a proper class action, certifying Plaintiffs as Class representatives and appointing Plaintiffs' counsel as Class Counsel under Rule 42 of the Texas Rules of Civil Procedure;

b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

d)    Awarding rescission or a rescissory measure of damages; and

e)    Such equitable/injunctive or other relief as deemed appropriate by the Court.


Dated: July 6, 2017                                   Respectfully Submitted,


                                                      **SANDERS BAJWA LLP**

                                                      /s/ *Yusuf Bajwa*
                                                      Yusuf A. Bajwa
                                                      Texas Bar No. 24047754
                                                      ybajwa@sandersbajwa.com
                                                      Erin Hudson
                                                      Texas Bar No. 24059978
                                                      ehudson@sandersbajwa.com
                                                      919 Congress Avenue, Suite 750
                                                      Austin, Texas 78701

Telephone:  512-535-5220
Facsimile 512-270-5111

**THE ROSEN LAW FIRM, P.A.**

Keith R. Lorenze
Texas Bar No. 24046313
101 Greenwood Avenue, Suite 440
Jenkintown, PA  19046
T: (215) 600-2817
F: (212) 202-3827
Email: klorenze@rosenlegal.com

**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen
275 Madison Avenue, 34th Floor
New York, NY  10016
T: (212) 686-1060
F: (212) 202-3827
Email: lrosen@rosenlegal.com
*Pro Hac Admission Pending*

**GOLDBERG LAW PC**

Michael Goldberg, Esq. (SBN 188689)
13650 Marina Pointe Dr. Suite 1404
Marina Del Rey, CA 90292
Phone: 1-800-977-7401
Fax: 1-800-536-0065
*Pro Hac Admission Pending*

***Counsel for Plaintiffs***

34